IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Wiley Y. Daniel

Civil Action No. 09-cv-02014-WYD-CBS

VAIL RESORTS, INC., a Delaware Corporation,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

## ORDER

---

The matters before the Court are Plaintiff's Motion For Summary Judgment [ECF No. 33] and Defendant's Motion For Summary Judgment [ECF No. 32].  The Court has determined that the motions can be resolved on the parties' extensive briefing and that no oral argument is necessary.

## I.  BACKGROUND

This case involves Plaintiff Vail Resorts, Inc.'s (Vail) claims for income tax refunds allegedly overpaid to the Internal Revenue Service (IRS) in tax years 2000 and 2001.  Vail amended its tax returns for those years in 2004 and 2005, but the IRS denied Vail's refund claims.  Understanding the basis of Vail's refund requests requires review of the extensive audit history between the parties.

A.      Audit History

Beginning in approximately 1990, the IRS conducted multi-year audits of the

consolidated group of companies known first as Gillette Holdings, Inc. (GHI) and, after

1997, Vail.  The IRS audited three separate time periods: 1985 to 1990, 1992 to 1994,

and 1995 to 1998.[1]

The first audit, covering 1985 to 1990, initially ended with a determination by the

IRS that there would be no material change to Vail's tax liability for the audited time

period and was terminated without any formal resolution.[2]

In 1991, GHI emerged from a bankruptcy reorganization, which constituted an

"ownership change" under the loss limitation rules of 26 U.S.C. § 382.[3]  The second

audit, covering 1992 to 1994, included several issues related to this bankruptcy.[4]

Five years into the second audit the IRS was continuing to raise new, technical

tax issues.[5]  Given the audit's length, Vail asked the IRS to identify those specific issues

that it either was pursuing or may pursue before the close of the audit.[6]  In response,

the IRS prepared an initial list of items that it was pursuing or may pursue, and

---

[1]Pl.'s Mot. For Summ. J. (Doc. No. 33; Sep. 17, 2010), Ex. 3 at 21:3-5, 26:1, 37:10-18 (Deposition of David Moskol) [hereinafter Moskol Dep.].  David Moskol was the lead tax representative for Vail during the audits.

[2]Moskol Dep. at 24:24-25:10, 26:15-16.

[3]Compl. (Doc. No. 1; Aug. 24, 2009) at ¶ 13; Pl.'s Mot. For Summ. J., Ex. 4 (Form 1120X: Amended Tax Return for Tax Year 2000).

[4]Moskol Dep. at 32:11-36:21.

[5]Moskol Dep. at 56:12-23.

[6]Moskol Dep. at 56:12-58:8.

thereafter Vail and the IRS entered into a letter agreement that identified all issues for possible examination.[7]

Following the letter agreement, the parties negotiated a Closing Agreement executed July 10, 2002 (First Closing Agreement).[8]  The First Closing Agreement completed the audit with respect to the 1985-94 tax years.

After execution of the First Closing Agreement, the parties continued the ongoing examination of the 1995-1998 tax years.  The remaining audit issues were resolved in a Closing Agreement executed on March 28, 2003 (Second Closing Agreement).[9]

### B.    Closing Agreements

Both Closing Agreements have the same form.[10]  The Agreements are split into four sections.  The first section, which the parties refer to as the "whereas clauses," lists the "disputes, as identified during the Commissioner's examination of the tax years" at issue.[11]  The disputes between the parties are limited, by the explicit language of the Agreements, to those identified in the whereas clauses.[12]

---

[7]Moskol Dep. at 67:19-69:16; Pl.'s Mot. For Summ. J., Ex. 5 at 82:6-22, 93:16-20 (Deposition of Mac Marriott) [hereinafter Marriott Dep.]; Pl.'s Mot. For Summ. J., Ex. 7 (Oct. 31, 2000 letter agreement). Mac Marriott led the IRS audit team beginning with the second audit.

[8]Compl. at ¶ 17; Pl.'s Mot. For Summ. J., Ex. 1 (First Closing Agreement).

[9]Compl. at ¶ 18; Pl.'s Mot. For Summ. J., Ex. 2 (Second Closing Agreement).

[10]The First Closing Agreement was used as a template for drafting the Second Closing Agreement. Marriott Dep. 158:21-24.

[11]First Closing Agreement at 2; Second Closing Agreement at 1.

[12]"[D]isputes have arisen . . . over what is the proper tax treatment in the circumstances referred to in each of the preceding . . . paragraphs of this agreement." First Closing Agreement at 2; Second Closing Agreement at 1.

In the First Closing Agreement, the following disputes are identified in the whereas clauses:

- Bankruptcy restructuring costs in 1992-93 tax years (¶ 2 of whereas clauses).

- Section 1071 nonrecognition of gain on the sale of a Nashville, Tennessee television station in 1989 (¶ 3).

- Deduction of post-petition interest in the 1991-92 tax years (¶ 4).

- Net operating loss (NOL) reduction due to cancellation of debt in 1992 (¶ 5).

- Depreciation of clearing and grading of mountain roads, slopes, and trails between 1985-94 (¶¶ 6-7).

- Valuation of acquired assets in 1985 (¶ 9).[13]

The Second Closing Agreement identified the following disputes:

- Depreciation of clearing and grading of mountain roads, slopes, and trails between 1995-98 (¶¶ 2-3 of whereas clauses).

- Deduction of real estate cost of sales expenses (¶ 4).[14]

The second sections of the Closing Agreements are prefaced by the statement "NOW IT IS HEREBY DETERMINED AND AGREED for federal income tax purposes

---

[13]First Closing Agreement at 1-2.

[14]Second Closing Agreement at 1.

that . . . ."[15]  This section is referred to by the parties as the "determination clauses" and announces the resolution of each of the disputes previously identified in the whereas clauses.

In the First Closing Agreement, the following determinations were announced:

- Certain deductions for bankruptcy restructuring costs were disallowed (Numbered ¶ #1; determination relates to the dispute announced in ¶ 2 of the whereas clauses).

- Gain on television station sale increased income for tax year 1989 (¶ #2; relates to ¶ 3 of whereas clauses).

- Post-petition interest deductions were allowed as deductions (¶ #3; relates to ¶ 4 of whereas clauses).

- NOL reduced by cancellation of debt (¶ #4; relates to ¶5 of whereas clauses).

- Depreciation values fixed for clearing and grading of mountain roads, slopes, and trails (¶¶ #5-8; relates to ¶¶ 6-7 of whereas clauses).

- Finalized valuation of assets acquired in 1985 (¶ #9; relates to ¶ 9 of whereas clauses).[16]

In the Second Closing Agreement, the following determinations were announced:

---

[15]First Closing Agreement at 2; Second Closing Agreement at 1.

[16]First Closing Agreement at 2-5.

- Depreciation values fixed for clearing and grading of mountain roads, slopes, and trails (Numbered ¶¶ #1-4; determination relates to the dispute announced in ¶¶ 1-3 of the whereas clauses).

- Deduction allowance for real estate cost of sales (¶¶ #5-6; relates to ¶ 4 of whereas clauses).

- The First Closing Agreement was incorporated by reference (¶ #7).[17]

The third section of the Closing Agreements is prefaced by the statement "[a]s a result of the aforementioned agreement described in clauses 1 through [#], preceding, Taxpayer and Commissioner agree to the following:."[18]  This section is referred to by the parties as the "results clauses" and identifies the amount of tax attributes as of the end date of the tax years covered by each Agreement.  The paragraphs in this section, numbered sequentially to the last numbered paragraphs in the determination clauses, do not directly relate back to either the whereas or determination clauses and generally uses language and terminology that is not defined or used elsewhere in the Agreements.

Notable are the paragraphs in these clauses that reference calculated consolidated NOL amounts.  In the First Closing Agreement, these paragraphs provide:

> 11. The consolidated Net Operating Loss ("NOL") equals $293,066,926 as of January 1, 1995.

---

[17]Second Closing Agreement at 2-4.

[18]First Closing Agreement at 5, Second Closing Agreement at 4.

12. The consolidated Unrestricted Net Operating Loss ("NOL") equals $66,535,856 as of January 1, 1995.[19]

In the Second Closing Agreement, a paragraph provides:

9. The consolidated Net Operating Loss ("NOL") equals $229,564,173 as of January 3, 1999, of which the restricted NOL equals $191,212,185 and the unrestricted NOL equals $38,351,988.[20]

The final section begins with the statement "THIS AGREEMENT IS FINAL AND CONCLUSIVE EXCEPT:."[21]  This section contains three clauses that describe the scope and effect of the closing agreement.  It is undisputed that this language was taken directly from the IRS Form 906 template closing agreement.

### C.    IRS Notice 2003-65

Subsequent to the execution of the Second Closing Agreement, the IRS issued Notice 2003-65 announcing "safe harbor" rules a taxpayer may apply to determine the amount of NOLs that may be deducted from a company's income following a "change in ownership."[22]

For federal income tax purposes, an NOL occurs when certain tax-deductible expenses exceed taxable revenues for a taxable year.  A deduction is allowed for this loss, permitting an organization to apply that loss to taxable income by carrying the loss

---

[19]First Closing Agreement at 5.

[20]Second Closing Agreement at 4.

[21]First Closing Agreement at 5; Second Closing Agreement at 5.

[22]IRS Notice 2003-65, 2003-2 C.B. 747, 2003 WL 22113991.

deduction back three years and forward (NOL carryforward) fifteen years, which can result in a reduction of an organization's tax liability in these years.[23]

When a company experiences a recognized "ownership change," the acquiring company may apply only some of the acquired company's NOLs as deductions, subject to certain limitations (Section 382 limitation).[24]  Section 382(b)(1) provides the basic formula to calculate the annual limitation on the amount of NOLs that may be used after an ownership change.  If the full annual limitation amount is not used in a given year, the annual limitation may be allowed to increase in subsequent years.[25]

Under Section 382(h), this annual limitation is increased if a corporation has net unrealized built-in gains at the time of the ownership change and such gains are recognized in any of the five taxable years following the ownership change.  Thus, if a company actually or constructively disposes of an asset that it owned pre-change, at a gain and within this five year period, that built-in gain (BIG) may increase the Section 382 limitation.  The rules in Section 382(h) are referred to as the RBIG (recognized built-in gain) rules.

In September 2003, the IRS issued Notice 2003-65 which provided guidance on how to apply the Section 382(h) RBIG rules.  The Notice announces two alternative, "safe harbor" approaches for recognition of BIG following a change in ownership: the

---

[23]*See* 26 U.S.C. § 172; Tualatin Valley Builders Supply, Inc. v. United States, 522 F.3d 937, 939 n.2 (9th Cir. 2008).

[24]26 U.S.C. § 382.

[25]26 U.S.C. § 382(b)(2).

1374 Approach and the 338 Approach.  Under the heading "Reliance on Notice," it is expressly stated that the Notice can be applied retroactively.  Further, the Notice affirms that the IRS will not take a position contrary to that stated in the Notice if the taxpayer consistently applies one of the approaches contained within.

### D.   Vail's Reaction to Notice 2003-65

Prior to the issuance of the Notice, Vail added RBIG to its Section 382 limitation only when it *sold* an asset at a gain during the recognition period.[26]  However, the 338 Approach allowed Vail to treat assets as generating RBIG even if those assets were not actually sold but were instead *constructively disposed of* at a gain during the recognition period.[27]  For example, using the 338 Approach, Vail believed that it could deduct RBIG for an asset that it was "using up" through depreciation or amortization, rather than selling.[28]

Applying the 338 Approach to its 2000 and 2001 tax returns allowed Vail to increase the amount of BIG it could recognize in those tax years, which increased Vail's annual Section 382 limitation, which resulted in an increase in the amount of NOLs that Vail was entitled to deduct.[29]  This higher deduction allowed Vail to deduct more of its

---

[26]Moskol Dep. at 140:6-12.

[27]IRS Notice 2003-65, Section IV; Moskol Dep. at 137:19-138:24, 140:6-12.

[28]Moskol Dep. at 140:6-12.

[29]Pl.'s Mot. For Summ. J., Ex. 4.

already existing NOLs that had been unused and unavailable under the lower Section 382 limitation, and allegedly reduced Vail's tax obligations in 2000 and 2001.

### E.     2000 and 2001 Amended Returns

As a result of applying the 338 Approach to its 2000 and 2001 tax years, Vail filed amended returns to recoup taxes it claimed were excessively paid.  The IRS denied Vail's amended returns, asserting that the Closing Agreements precluded application of Notice 2003-65 to Vail because Vail's NOLs were fixed by the terms of those Agreements.[30]  Following this unfavorable decision, Vail timely filed suit in this Court to recover its income tax overpayments.

## II.     RELIEF REQUESTED

Vail seeks partial summary judgment that the Closing Agreements do not bind Vail to a fixed BIG, RBIG, Section 382 limitation, or NOL amounts and, consequently, that the taxes for the 2000 and 2001 tax years were illegally assessed and collected. Vail asserts that, to the extent the IRS is liable for a refund, the parties have agreed to negotiate and resolve the amount of the refund owed.

Conversely, the IRS seeks entry of summary judgment and dismissal of the entire case on the grounds that Vail is foreclosed from amending its 2000 and 2001 tax returns based on the Closing Agreements.  Specifically, the IRS argues that by determining and agreeing upon specific amounts of consolidated NOL in the Closing Agreements, the parties locked themselves into these amounts.  The IRS claims Vail

---

[30]Compl., Ex. 4.

took a calculated risk that the finality of a fixed amount outweighed the opportunity that subsequent litigation, legislation, regulations, or policy announcements could produce benefits greater than those negotiated under the Agreements.

## III.    LEGAL STANDARD

### A.    Summary Judgment

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[31]   A dispute is "genuine" if the issue could be resolved in favor of either party.[32]   A fact is "material" if it might reasonably affect the outcome of the case.[33]

A party who does not have the burden of proof at trial must show the absence of a genuine fact issue.[34]   Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper.[35]   All the evidence must be viewed in the light most favorable to the party opposing the motion.[36]   However, conclusory

---

[31]Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[32]Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[33]Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[34]Concrete Works of Colorado, Inc. v. City and County of Denver, 36 F.3d 1513, 1517 (10th Cir. 1994).

[35]Id. at 1518.

[36]Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).

statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence.[37]

### B.     Tax Refund Cases

A suit for a tax refund is a *de novo* proceeding "in the nature of an action for money had and received and it is incumbent upon the claimant to show that the United States has money which belongs to him."[38]  The taxpayer has the initial burden of overcoming the presumption that the tax assessment is correct as a matter of law.[39] Once a taxpayer "introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer," the burden of proof shifts to the IRS on that issue.[40]

### C.     Closing Agreements

The IRS is authorized by statute to enter into a closing agreement with any person in order to resolve the tax liability of such person for any taxable period.[41]  The closing agreement must be in writing and is taken as a "final and conclusive" resolution "to the matters agreed upon."[42]

---

[37]Rice v. United States, 166 F.3d 1088, 1092 (10th Cir. 1999).

[38]Lewis v. Reynolds, 284 U.S. 281, 283 (1932).

[39]26 U.S.C. § 7491(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

[40]26 U.S.C. § 7491(a)(1).

[41]26 U.S.C. § 7121(a).

[42]26 U.S.C. § 7121 (a), (b) & (b)(1).  Closing agreements can only be set aside upon a showing of fraud, malfeasance, or misrepresentation of material fact. 26 U.S.C. § 7121(b).  Vail is not claiming any of these events in the present case.

The purpose of a closing agreement is to "enable the taxpayer and the government finally and completely to settle all controversies in respect of the tax liability for any previous taxable period, and . . . to prevent the filing of additional claims for refund or the institution of suit for the same purpose by the taxpayer."[43]  Closing agreements between the IRS and a taxpayer are governed by federal common law contract principles.[44]

Federal contract common law is interpreted to be the "standard principles of contract law - more precisely, the core principles of the common law of contract that are in force in most states."[45]  When a contract's meaning is clear and unambiguous, courts interpret the contract's meaning as a matter of law.[46]  In other words, "if a closing agreement's terms are clear and unambiguous, [the court is] obligated to enforce the language as it is written, without resort to extrinsic evidence of interpretive devices."[47]

Contract language is ambiguous when its "terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning

---

[43]Wolverine Petroleum Corp. v. Commissioner, 75 F.2d 593, 595 (8th Cir. 1935).

[44]Bethlehem Steel Corp. v. United States, 270 F.3d 135, 139 (3d Cir. 2001); Ellinger v. United States, 470 F.3d 1325, 1336 (11th Cir. 2006); United States v. Nat'l Steel Corp., 75 F.3d 1146, 1150 (7th Cir. 1996); Rink v. Commissioner, 47 F.3d 168, 171 (6th Cir. 1995); see also Union Pac. R.R. Co. v. United States ex rel. Army Corps of Eng'rs, 591 F.3d 1311, 1315 (10th Cir. 2010) (court must apply federal contract law to determine liability when dealing with a federal contract).

[45]S&O Liquidating P'ship v. Commissioner, 291 F.3d 454, 459 (7th Cir. 2002) (quoting Nat'l Steel, 75 F.3d at 1150).

[46]Bethlehem Steel, 270 F.3d at 139.

[47]S&O Liquidating P'ship, 291 F.3d at 459 (citing Nat'l Steel, 75 F.3d at 1150; Rink, 47 F.3d at 171 n.3).

13

of the words employed and obligations undertaken."[48]  A contract must be read to give

meaning to every word or phrase and will not be read to render words or phrases

"meaningless, redundant, or superfluous."[49]  Closing agreements are treated as fully

integrated agreements.[50]

## IV.   ANALYSIS

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(1).

Venue is proper in this Court pursuant to 28 U.S.C. § 1402(a)(2).

The critical issue in this case is the parties' intent in identifying the consolidated

NOL[51] amounts in the results clauses of the Closing Agreements.  The IRS argues that

the Agreements permanently and conclusively fixed this amount and Vail is estopped

from amending these settled values.  Conversely, Vail argues that these amounts were

merely computational and added to the Agreements solely to indicate the effect that the

issues actually resolved by the audits had on various tax attributes.  Therefore, Vail

claims that since RBIG was not part of the issues the parties settled in the audits or the

Closing Agreements, it is entitled to amend this value based on the contents of IRS

Notice 2003-65.

---

[48]Young v. IMO Indus., Inc., 541 F.Supp.2d 433, 445 (D. Mass 2008) (applying federal common law).

[49]United States v. Brye, 146 F.3d 1207, 1211 (10th Cir. 1998) (citation omitted).

[50]Marathon Oil Co. v. United States, 42 Fed. Cl. 267 (1998), aff'd 215 F.3d 1343 (Fed. Cir. 1999) (table).

[51]Consolidated NOL incorporates tax adjustments caused by BIG, RBIG, and the Section 382 limitation.

### A.      Limited Scope of Closing Agreements

General contract principles command this Court to determine the parties' intent by first examining the four corners of the Agreements.[52]  However, unlike a contract, closing agreements are statutory in nature.[53]  Therefore, interpretation of a closing agreement necessarily requires review of 26 U.S.C. § 7121, along with the IRS policies interpreting and implementing that statue, in order to understand the permissible scope of such agreements.[54]

Pursuant to § 7121, closing agreements are taken to be a "final and conclusive" resolution of the tax liability of an entity "to the matters agreed upon."[55]  In accordance with this statutory mandate, closing agreements are to be strictly construed, and **"only matters specifically spelled out in a closing agreement as being resolved will be treated as settled**."[56]  "'Premises underlying the agreement,' or premises 'not specifically noted as settled are not binding on the parties to the agreement.'"[57] For ease

---

[52]Rink, 47 F.3d at 171; *see also* Level 3 Commc'ns, LLC v. Liebert Corp., 535 F.3d 1146, 1154 (10th Cir. 2008) (applying Colorado contract law).

[53]*See* 26 U.S.C. § 7121.

[54]*See, e.g.*, Nat'l Steel, 75 F.3d at 1150 (closing agreements, although essentially analyzed as contracts, are treated differently in certain situations).

[55]26 U.S.C. § 7121(a), (b), and (b)(1).

[56]Ellinger, 470 F.3d at 1336-1337 (*quoting* Geringer v. Commissioner, 61 T.C.M. (CCH) 1738, at *8 (Jan. 28, 1991) (*citing* Zaentz v. Commissioner, 90 T.C. 753, 766, 1988 WL 34876 (1988))) (emphasis added); *see also* Nat'l Steel, 75 F.3d at 1150; Klein v. Commissioner, 899 F.2d 1149, 1152 (11th Cir. 1990); Bowling v. United States, 510 F.2d 112, 113 (5th Cir. 1975).

[57]Ellinger, 470 F.3d at 1336-1337 (*quoting* Geringer, 61 T.C.M. (CCH) 1738 at *8 (*citing* Zaentz, 90 T.C. 753 at 766)).

of further discussion, the Court will refer to any "final and conclusive" resolution of a tax matter "specifically spelled out in a closing agreement as being resolved" as a § 7121(b) Agreement.

The IRS' internal policies reiterates that closing agreements are limited in their scope. The IRS implemented Revenue Procedure 68-16 (Rev. Proc. 68-16) to standardize its treatment of closing agreements.[58] This Procedure advises that a closing agreement "may determine either the total tax liability . . . or one or more separate items affecting such liability or both."[59] Rev. Proc. 68-16 indicates that final determinations of specific matters are ordinarily reflected on Form 906 and provides guidelines as to the required elements of a closing agreement:

> The identification of the parties is followed by one or more WHEREAS clauses which serve to introduce the subject matter of the agreement and state premises upon which it is based. These clauses should ordinarily be brief . . . .
>
> It is important to distinguish between matters which are merely informative and explanatory and matters which are being agreed upon. The former should be segregated from the latter and should ordinarily be reflected in the introductory recitals contained in the WHEREAS clauses . . . . To emphasize the transition from recitals to matters being determined and agreed upon, the latter should be separate from and follow the WHEREAS clauses and should ordinarily be preceded by the caption 'NOW IT IS HEREBY DETERMINED AND AGREED,'

---

[58]Rev. Proc. 68-16, 1968-1 C.B. 770. A Revenue Procedure is "a statement of procedure that affects the rights and duties of taxpayers or other members of the public under the Code and related statutes or information that, although not necessarily affecting the rights and duties of the public, should be a matter of public knowledge." 26 C.F.R. § 601.601(d)(2)(b). Courts generally accord Revenue Procedures significant deference. Tualatin Valley, 522 F.3d at 941; see also Bethlehem Steel, 270 F.3d at 141.

[59]Rev. Proc. 68-16.

usually followed by the qualification 'for Federal (type of tax) purposes that:.' For clarity, the matters being agreed upon should generally be logically grouped in separate numbered determination clauses. Each such clause should ordinarily be drafted with the view that it is a continuation of the statement 'NOW IT IS HEREBY DETERMINED AND AGREED for Federal (type of tax) tax purposes that:.'[60]

The conclusion to be drawn from these authorities is that any matter intended to be treated as a § 7121(b) Agreement must be explicitly mentioned in a closing agreement as an item the parties have specifically agreed to.  Conversely, mere reference to a tax attribute or tax property is insufficient to deem it a matter that has be conclusively resolved.[61]

### B.    The Closing Agreements

The IRS does not appear to argue that Vail is foreclosed from *any* tax amendment in the taxable years covered by the Closing Agreements.  Indeed, a cursory review of the Closing Agreements indicates that only specific tax issues are discussed and there is no language indicating the Agreements were meant to act as a complete

---

[60]Id.  The IRS additionally seeks to rely on language contained within Internal Revenue Manual (I.R.M.) § 8.13.1.  However, that I.R.M. section is expressly stated to be advisory in interpreting pre-existing closing agreements rather than being a conclusory authority on how closing agreements should be drafted. Id.  Additionally, courts generally treat the I.R.M. as directory, rather than mandatory, and afford little deference to their contents when analyzing tax issues. *See* Fargo v. Commissioner, 447 F.3d 706, 713 (9th Cir. 2006) (*quoting* Marks v. Commissioner, 947 F.2d 983, 986 n.1 (D.C. Cir. 1991)).

[61]*See* Bethlehem Steel, 270 F.3d at 140 (reference to § 212 of tax code was insufficient to fix that statue's present contents as the method to be used in calculating the tax consequences of the closing agreement; subsequent amendment of § 212 was instead used notwithstanding an anti-retroactivity clause elsewhere in the agreement); Nat'l Steel, 75 F.3d at 1150.

bar to any future amendment.[62]  Instead, the IRS argues that since consolidated NOLs

are present in the Agreements with defined, fixed amounts attached to them, this must

be taken to be a conclusively agreed upon matter.  Therefore, the IRS maintains that

any tax amendment that would alter these fixed consolidated NOL values is foreclosed

under the terms of the Agreements and the finality provision contained in 26 U.S.C.

§ 7121(b).

After reviewing the Closing Agreements, the Court finds that the Agreements

unambiguously did not intend to permanently fix the amount of consolidated NOLs

available in the taxable years covered by the Agreements.

1.      Whereas Clauses

It is undisputed that neither consolidated NOL (nor BIG nor RBIG) are mentioned

in the whereas clauses.  Since whereas clauses are normally designed to "*introduce* the

subject matter of the agreement," and are meant to be "*informative and explanatory,*"

omission of a tax matter from the whereas clause does not *per se* mean that the item is

not part of the agreement.[63]

However, the Agreements here clearly intend to link these introductory

descriptions in the whereas clauses with the resolutions defined in the determination

clauses.  As shown *supra*, every substantive whereas clause is associated with one (or

---

[62]*Compare with In re* Hopkins, 146 F.3d 729, 731 (9th Cir. 1998) (a whereas clause stated "the parties wish to resolve with finality the Federal income tax consequences of their investment in the Partnership;" this language in closing agreement foreclosed any further tax amendment dealing with the partnership).

[63]Rev. Proc. 68-16 (emphasis added).

more) determination clauses.  This linking demonstrates that the whereas and determination clauses are to be read together to fully define and describe the issues resolved.  The whereas clauses introduce and define the subject matter; the determination clauses implicitly incorporate these definitions and then describe how these issues have been formally resolved.  Absence of a tax matter in the whereas clauses implies that it was not an issue intended to be resolved.  Thus, in context of these Agreements, the complete omission of consolidated NOLs in either the whereas clauses or the determination clauses clearly indicates that a final determination of the NOL amounts was not intended to be part of the § 7121(b) Agreements.

Additionally, the whereas clauses specifically announce that the disputes in this matter are contained "in each of the *preceding* paragraphs of this agreement" and that the "parties have reached an agreement on how to resolve the *aforementioned* disputes."[64]  These clauses are not boilerplate language mentioned in Rev. Proc. 68-16 or contained in Form 906.  Since the parties intentionally drafted and inserted this language, the intention is to restrict the § 7121(b) Agreements to only those tax matters first discussed in the whereas clauses.  Since consolidated NOL does not appear in the whereas clauses, the plain language of the Agreements indicates that they were not intended to be part of the § 7121(b) Agreements.

2.    Determination Clauses

---

[64]First Closing Agreement at 2; Second Closing Agreement at 1 (emphasis added).

As with the whereas clauses, the determination clauses undisputably reference neither consolidated NOL (nor BIG nor RBIG).  Given that the determination clause is intended to conclusively identify "matters being determined and agreed upon," complete omission of consolidated NOL from this section is a persuasive indication that fixing the amount of NOL was not part of the § 7121(b) Agreements.[65]

To circumvent this glaring omission, the IRS argues that the results clauses is not independent from the determination clauses and, instead, that the results clauses must be read as an extension and continuation of the determination clauses.  This argument is unavailing.

The IRS' argument requires unwavering reliance on the preferred formatting of the closing agreement as identified by Rev. Proc. 68-16 and Form 906.  Pursuant to these authorities, closing agreements are to only have two sections: whereas clauses and determination clauses.  In this rigid construction of a closing agreement, everything appearing before the "HEREBY DETERMINED" language is necessarily interpreted as part of the whereas clauses and everything after is interpreted as the determination clauses.

However, a rigid interpretation of the recommended closing agreement framework would require a complete disregard of both the context and language of the Closing Agreements as drafted by the parties in this case.  Although persuasive, Rev.

---

[65]Rev. Proc. 68-16.

Proc. 68-16 and Form 906 must be analyzed in conjunction with the actual language the parties decided to use in this matter.

Here, the Form 906 template was not robotically followed.  As mentioned above, the whereas clauses were used as something more than just introductory material here, in direct contradiction to the mandates of Rev. Proc. 68-16.  More importantly, use of results clauses is not contemplated by any IRS authority.  In these Closing Agreements, the content is more important than the directives as to how they were recommended to be drafted.

It is undisputed that the introductory language of the results clauses in the Agreements is stylistically set-off from the numbered paragraphs of the determination clauses preceding it and the numbered paragraphs of the results clauses proceeding it. The determination clauses are intended to be read as if they are a "continuation of the statement 'NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes that:."[66]  Interrupting the progression of numbered paragraphs is a clear delineation between the content blocks and indicates that the paragraphs above and below this text should be treated differently based on the content within the inserted introductory paragraph.  In other words, the results clauses' introductory paragraph is intended to supersede the determination clauses' introductory phrase for clauses that follow it.

---

[66]Rev. Proc. 68-16.

Numbered paragraph 11 in the First Closing Agreement will be used as an example. The IRS, arguing that all numbered paragraphs should be treated as a determination clause, requests that this paragraph be read as: "NOW IT IS HEREBY DETERMINED AND AGREED for federal income tax purposes that: [t]he consolidated [NOL] equals $293,066,926 as of January 1, 1995." However, this reading entirely ignores the introductory paragraph at the beginning of the results clauses, an improper result when interpreting a contract.[67]

The introductory paragraphs are likewise not additive. This interpretation is also improper: "NOW IT IS HEREBY DETERMINED AND AGREED for federal income tax purposes that: [a]s a result of the aforementioned agreement described in clauses 1 through 9, preceding, Taxpayer and Commissioner agree to the following: [t]he consolidated [NOL] equals $293,066,926 as of January 1, 1995." This construction is not only redundant,[68] but the phrase "aforementioned agreement described in clauses 1 through 9" indicates that paragraphs 1-9 are logically and substantively different than paragraphs 10-18.

Instead, Paragraph 11 is correctly read as: "As a result of the aforementioned agreement described in clauses 1 through 9, preceding, Taxpayer and Commissioner agree to the following: [t]he consolidated [NOL] equals $293,066,926 as of January 1, 1995." Interpreted in this latter manner it is evident that paragraph 11 is intended to

---

[67] *See* <u>Brye</u>, 146 F.3d at 1211 (words or phrases in contract should not be interpreted as to be meaningless).

[68] *See* <u>id.</u> (words or phrases in contract should not be interpreted as to be redundant).

22

describe the *effects* of all of the previous agreements contained in the determination clauses, rather than being a § 7121(b) Agreement itself.

    3.    Results Clauses

    The results clauses are the only mention of consolidated NOLs in the Agreements.[69]  The existence of results clauses is neither mentioned nor contemplated in either Rev. Proc. 68-16 or Form 906.  Although non-determinative, this suggests that the clauses were not intended to indicate "matters being determined and agreed upon," since this task is already handled by the determination clauses and, thus, would be duplicative in the context of these Agreements.[70]

    Reference to a term not defined elsewhere in the agreement and not specifically declared as agreed upon is a significant indication that it is not part of the resolved issues.[71]  The terms "consolidated NOL" and "unrestricted consolidated NOL" are never defined; the terms are simply mentioned and dollar values assigned.  Further, no explanation is provided as to how these values were calculated.  Unlike the agreements announced in the determinations clauses, which are first introduced in the whereas clauses and then subsequently incorporate either calculation detailed tables or attached

--------

[69]The First Closing Agreement mentions "NOL" in its whereas and determination clauses, but this reference is very specific to cancellation of debt for the 1992 tax year, not to any issue associated with BIG, RBIG, or the Section 382 limitation. First Closing Agreement at 1-2.

[70]*See* Brye, 146 F.3d at 1211.

[71]*See, e.g.*, Nat'l Steel, 75 F.3d at 1151 (reference to an IRS code section, without an express agreement as to the application in the present case, did not foreclose a future retroactive application of the changed section).

spreadsheets, consolidated NOLs are summarily announced and then immediately forgotten.

The IRS argues that the plain meaning of the term "agree" in the introductory paragraph to the results clauses demonstrates that the parties intended that the consolidated NOLs were designed to be definitive, final resolutions.  In the context of this usage of "agree", coupled with the content of the remainder of the Agreements, I find it does not refer to the parties agreeing to additional § 7121(b) Agreements. Rather, the I find "agree" to mean the parties concurred on the effects that their previously announced determination clause § 7121(b) Agreements had on various tax attributes.  In other words, the parties agreed that the amounts contained in the results clauses were a correct "snapshot" of Vail's tax attributes at the moment the Agreements were executed.  These specific dollar amounts ensured that the parties were on the same page when it came to the tax consequences of the resolved issues, since it would be necessary for Vail to subsequently amend its tax returns based on the Closing Agreements' determinations.[72]

4.      The Closing Agreements Are Unambiguous

The Court's interpretation of the Closing Agreements reconciles a closing agreement's limited scope while ensuring that the language in the results clauses are not rendered superfluous or meaningless.  In the results clauses, the parties were

---

[72]The Court notes, with no small amount of irony, that inclusion of the results clauses has resulted in just the opposite: disagreement as to the ultimate effect of the Closing Agreements.

agreeing to the *consequences* of their resolved audit issues; they were not announcing additional § 7121(b) agreements.

There is no ambiguity in the Closing Agreements.[73]  Consolidated NOL totals were not a "matter agreed upon" and the amount located in the results clauses were not designed to be "final and conclusive."  If the IRS (or Vail) wanted a full and final settlement of *all* potential issues in the 1985-1998 tax years, such language should have been included.[74]  However, as written, the Closing Agreements allow Vail to freely alter tax attributes relating to BIG, RBIG, and the Section 382 limitation.

### C.    IRS Notice 2003-65

Notice 2003-65 is clear that it can be applied retroactively at the discretion of the taxpayer.  Since the parties did not fix the amount of NOL in the Closing Agreements, Vail was entitled to take advantage of Notice 2003-65 to file an amended tax return and recover its overpaid taxes.

The Court is not deciding today whether Vail is entitled to a tax refund for the 2000-01 taxable years.  The Court is only finding that the IRS' decision to reject the amended tax returns on the basis that Vail had foreclosed amendment of its NOL was inappropriate.

---

[73]Since no ambiguity exists in the Closing Agreements, there is no need to introduce or examine extrinsic evidence.  However, even if the Court introduced extrinsic evidence for the limited purpose of determining if an ambiguity does exist, *see* Level 3, 535 F.3d at 1155, the Court notes that none of the parties involved in drafting the Agreements testified that consolidated NOL, BIG, or RBIG were ever contemplated to be part of the agreement.

[74]*See* Nat'l Steel, 75 F.3d at 1151.

**V.     ORDER**

Accordingly, it is ORDERED that Plaintiff's Motion For Summary Judgment (Doc.

No. 33; Sep. 17, 2010) is **granted**.  It is

FURTHER ORDERED that Defendant's Motion For Summary Judgment (Doc.

No. 32; Sep. 17, 2010) is **denied**.

Dated:  July 1, 2011


BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge